PRESENT—HON. JOHN F. DILLON, CIRCUIT JUDGE.
HON. MARK W. DELAHAY, DISTRICT JUDGE.

NATIONAL BANK OF CLEVELAND V. CITY OF IOLA.　　| 9  689|
| 55  362|

1. LEGISLATIVE POWER; *Retrospective Laws.* Where the legislature can legally grant or confer authority to hold an election for a particular purpose, it can ratify and confirm an election held for such purpose without such legislative authority; but the legislature cannot do by a curative or retrospective act what it could not have previously authorized.

2. SPECIAL LAWS; *Corporate Powers.* An act limited in its application to a single city, and a single election, and the issue of specific bonds, is manifestly a special act; and where such act undertakes to authorize such city to issue its bonds in aid of a manufacturing enterprise, and to levy and collect taxes to pay such bonds, it undertakes to confer upon such city certain corporate powers. Special acts conferring corporate powers are forbidden by ₴ 1 of article 12 of the constitution of Kansas, and are void. [Citing and following *Atchison v. Bartholow*, 4 Kas., 124, and *Wyandotte v. Wood*, 5 Kas., 603.]

3. PRIVATE ENTERPRISES; *Taxation in aid of, void.* The legislature cannot legally and constitutionally exercise the right of taxation in such manner and to such extent as to compel or coerce the citizen to aid in the establishment of purely private enterprises or objects, nor for the payment of municipal bonds issued in aid of such private enterprises; and statutes enacted for such purposes are unconstitutional and void.

4. TAXATION; *Object and Purposes.* Taxation is a mode of raising revenue for *public purposes.* When it is prostituted to objects in no way connected with the public interests, it ceases to be taxation and becomes

44

plunder; and the establishment of a bridge manufactory, or foundry, owned by private individuals, is essentially a private enterprise.

5. MUNICIPAL BONDS; *Want of Power to Issue, Notice of, Presumed.* Bonds issued by a municipality in aid of strictly private enterprises, are void— void from the beginning, and void into whosesoever hands they may have come. All persons must at their peril take notice of the *power* of municipal corporations or officers to issue securities, and especially is this so where the want of power results from constitutional prohibitions or provisions.

ACTION brought by the *Commercial National Bank of Cleveland,* of Cleveland, Ohio, as plaintiff, against *The City of Iola,* as defendant, to recover the amount of certain matured coupons attached to bonds issued by the *City of Iola,* a city of the state of Kansas. The declaration (or petition) is in the usual form, (as are the coupons, copies of which are filed therewith,) and avers that such coupons "were issued in pursuance" of ch. 80 of the laws of Kansas passed in 1871, "which went into effect February 23, 1871." This act is published in the volume of laws of 1871, p. 195; and as the preamble and act together show that the election at which the bonds were voted was, when held, known to be without legal authority, and show also that the particular purpose for which the bonds were to be voted, (and issued, if voted,) was to aid a private enterprise, said ch. 80 is here inserted in full, and is as follows:

AN ACT to legalize a certain election for Bonds to aid in constructing and operating Foundry and Machine-Shops in the City of Iola, Kansas, and authorizing the mayor and council of said city to issue bonds in accordance therewith.

WHEREAS, The city of Iola, in the county of Allen and state of Kansas, did, by its Ordinance No. 32, provide for holding a special election at the city hall in the said city of Iola, for the purpose of submitting to the qualified electors of said city the proposition, "Whether the mayor and common council of said city shall execute and deliver to Z. King, or Mills & Smith, bonds of the city of Iola in an amount of $50,000, in consideration of said parties locating, constructing and operating foundry and machine-shops, for the manufacture of King's patent wrought-iron tubular and channel arch bridges, and of plows and stoves, etc., within one half-mile of the limits of said city," and appointing a day for the holding of such election, which

said ordinance was dated the nineteenth day of December, 1870; and

Whereas, The said city, by its Ordinance No. 33, did amend the said Ordinance No. 32 in such manner as that the 9th day of January 1871 was appointed by the said mayor and common council as the time when such election should be held, which said ordinance was dated January 4th, 1871; and

Whereas, Such election was held pursuant to public notice, given by publication of the time and place of holding the same, as fixed by the said Ordinance No. 32, in the *Kansas State Register*, a weekly newspaper published and of general circulation in said city, and by posting ten printed copies of said Ordinance No. 33, amendatory as aforesaid, together with the proclamation of the mayor of said city, fixing the time on the 9th day of January 1871, as aforesaid, in ten public places in said city; and

Whereas, Such election was held in conformity with such notice, and the general election laws of the state of Kansas, and at the same time ballots were prepared on which were written or printed, " For the Bonds," and " Against the Bonds;" and

Whereas, The result of such election, so held as aforesaid, was unanimously in favor of the issuing of the said bonds for the purpose aforesaid: Therefore

*Be it enacted by the Legislature of the State of Kansas:*

Section 1. That the election held in the city of Iola, state of Kansas, on the 9th day of January 1871, and above more particularly referred to and described, and all proceedings had in conformity therewith, be and the same are hereby legalized.

Sec. 2. The city of Iola is hereby authorized and empowered, through and by its mayor and common council, to appropriate the sum of $50,000 to aid in the erection, completion, and equipment of buildings at or near the city of Iola, to be used for the purpose of manufacturing " Z. King's patent wrought-iron tubular and channel arch bridges," and a foundry and iron-works, and to issue and deliver to the said Z. King, or Mills & Smith, or to their legal representatives, the bonds of said city to the amount of $50,000, in sums of not less than one hundred dollars each, payable fifteen years after date, and bearing interest at the rate of ten per cent. per annum, with interest coupons attached, payable semi-annually, on the first days of January and July of each year, (except for the year 1871, for which year interest shall all be paid on the first day of January 1872,) and shall levy and collect such a per cent. on the taxable property of the said city as shall be sufficient to pay the interest on all bonds issued under the provisions of this act, as the same accrues, and to levy

and collect such other tax as shall constitute a sinking fund sufficient to pay said bonds at maturity.

SEC. 3. Said bonds and interest coupons shall be signed by the mayor of said city; and countersigned by the clerk thereof.

SEC. 4. This act to take effect and be in force from and after its publication,* etc.

The constitution of the state of Kansas contains the following provisions:

ART. 2, § 17. "In all cases where a general law can be made applicable, no special law shall be enacted."

ART. 12, § 1. "The legislature shall pass no special act

[*REPORTER's NOTE.—Said act (ch. 80) was not *approved* by the governor. The secretary of state in authenticating the act certifies, (laws of 1871, p. 197,) that "The foregoing bill, having been presented to the governor, and not having been approved by him or returned with his objections, within the time prescribed by the constitution, will take effect without his signature upon proper publication," and that said act "was published in the *Kansas Weekly Commonwealth* February 23, 1871." The failure of the governor to approve or to veto the bill may possibly be accounted for by referring to the action of the legislature at the previous session. During the session of 1870, the legislature passed an act, (House bill No. 151,) entitled "An act authorizing the trustees of the Burlingame town company to take stock in the *Burlingame Manufacturing Company* to the amount of $25,000, and to issue bonds therefor." Governor Harvey vetoed this bill. His veto message is dated February 25, 1870, and will be found in the House Journal for 1870, p. 1167. After some suggestions, whether the words, "Burlingame Town Company," in the title, had reference to a strictly private corporation, or were intended to refer to the Town of Burlingame, a public or municipal corporation having "for its object the government of a portion of the state," the governor says:

"Therefore I must proceed upon the presumption that the intention of the bill is to authorize the trustees of the town, *as officers of a public corporation* to take stock in the name of the town *in a private corporation organized for the manufacturing of woolen fabrics.* This proposition is objectionable for many reasons, the most prominent of which is, that it *authorizes taxation for purposes purely private,* (and that without submission to a vote of the people,) thus compelling all to contribute to a purpose which has no relation at all to the *government of the town* which was the sole object of the creation of the public corporations such as is represented by the trustees of the town of Burlingame."

The bill so vetoed was afterward passed, "the objections of the governor to the contrary notwithstanding:" in the House, by a vote of 66 yeas to 8 nays, (17 absent and not voting;) House Jour., p. 1237: and in the Senate by a vote of 18 yeas, nays none, (7 absent and not voting;) Senate Jour., p. 430. And the bill so passed was published, and stands as ch. 36, laws of 1870, p. 83.

While the Iola Bond bill was not vetoed, it is very evident that the executive still entertained the opinion that the right of taxation could not be

conferring corporate powers. Corporations may be created under general laws; but all such laws may be amended or repealed."

ART. 12, § 5. "Provision shall be made by general law for the organization of cities, towns, and villages, and their power of taxation, assessment, borrowing money, contracting debts

---

exercised in aid of purely private purposes and private enterprises; hence he did not "approve" said measure. But the Iola foundry and machine-shop bill did not get through the legislature without opposition. The House Judiciary committee by a majority vote only reported in favor of the bill; (House Jour., 1871, p. 105.) It came up on third reading January 31st. The writer of this note (one of the judiciary committee that had dissented,) opposed the bill upon the ground that its provisions were in flagrant violation of the constitution, and would be utterly void. But he was answered by the Iola local member, (who referred to the "election" recited in the "preamble" to the bill as proof,) that "the people of Iola *wanted* the foundry and machine-shops, and were *unanimously* in favor of the bill." The bill failed to pass for want of the constitutional number of votes; (Jour., pp. 181, 182.) A reconsideration was secured, and the bill came up again on third reading on Feb. 2d. It was now opposed not only by the writer, but by several others, principally those members who were lawyers. Among the latter number was Hon. Thos. P. Fenlon, of Leavenworth, (also a member of the judiciary committee,) who ably and earnestly maintained that the passing of the bill was positively forbidden by the constitution, and that it was unwise and unjust as a question of public policy. But the bill passed, yeas 63, nays 24, (11 absent and not voting;) Jour., pp. 230, 231. Of the twelve lawyers who were members, *seven* voted in the negative, and *three* were absent. In the senate the bill seems to have been regarded wholly as a *local* measure, and was concurred in almost without opposition, (yeas 16, nays 1, absent 8;) Senate Jour., pp. 250, 251.

Under ch. 36, laws of 1870, above mentioned, the *Town of Burlingame* issued bonds to the amount of $25,000 in payment for stock taken in the name of such corporation in a *woolen factory;* and after the publication of said ch. 80, laws of 1871, the *City of Iola* issued the $50,000 bonds mentioned in said act to aid in the building of a *foundry and iron-works.* In a few other towns and cities, bonds have been voted and issued for similar private purposes under some supposed legal authority. Under Judge Dillon's decision in the *Iola case,* all such bonds are void, in whose hands soever they may be.

*Registration of Municipal Bonds.*—Ch. 68, laws of 1872, (pp. 110 to 119,) is entitled, "An act to authorize incorporated cities, and municipal townships to issue bonds for the purpose of building bridges, aiding in the construction of railroads, water-power, or other works of internal improvement, and providing *for the registration of such bonds,* the registration of *other bonds,*"

and loaning their credit, shall be so restricted as to prevent the abuse of such power."

ART. 12, § 6. "The term corporation, as used in this article, shall include all associations and joint stock companies having powers and privileges not possessed by individuals and partnerships; and all corporations may sue and be sued in their corporate name."

The *City of Iola* demurred to the declaration on the ground

---

etc. Sec. 14 of said act requires the holders of all bonds issued under its provisions to present the same to the auditor of state for registration within thirty days after the delivery of such bonds; and § 15 authorizes the holder of any bonds issued under authority of any previous act of the legislature to present such bonds to the auditor for registration, etc. Sec. 16 requires the auditor annually on or before the 15th of August to ascertain the amount of interest accrued and to accrue on all bonds registered in his office before the tax for the next succeeding year shall be levied, and to certify the same to the county clerk, etc.; § 17 requires the county clerk to levy the amount so certified upon the taxable property of his county, etc.; and § 18 requires the county treasurer to pay the amount so levied and collected to the state treasurer to pay off the interest accrued on such bonds. Immediately after Judge Dillon's decision in the *Iola case* was announced, Hon. D. W. Wilder, auditor of state, addressed a letter to the Topeka *Commonwealth*, in which, after referring to such decision, he says:

"Bonds of this class (those issued in aid of *private* enterprises,) will not hereafter be registered. ∗ ∗ ∗ Section 11 of ch. 68, laws of 1872, has this proviso: 'That such bonds shall not bear interest or be negotiable until after the delivery and registration thereof.'. Of course, *if not registered*, they will not be in circulation, and the solvency and good name of our state will not be injured."

The *Burlingame Woolen-Mill Bonds* had been registered; and in July 1873 the county treasurer of Osage county applied to the auditor of state for information as to the raising of money to pay the interest "accrued and to accrue" on said *woolen-mill* bonds. The auditor referred the matter to Hon. A. L. Williams, attorney-general of Kansas, and received this reply:

ATTORNEY GENERAL'S OFFICE, TOPEKA, JULY 20th, 1873.
HON. D. W. WILDER, *Auditor of State:*

DEAR SIR: In deciding the Iola Bridge Bonds, and all other bonds issued in aid of private enterprises, null and void, Judge Dillon merely gave voice to the unanimous judgment of the bar of this state. All bonds of this description are void, and money collected from the people to pay them is not taxation, but robbery. No officers should levy, and no person should pay such a tax.     Yours respectfully,   A. L. WILLIAMS.

Acting upon this authority the auditor declines to certify the amount of interest "accrued and to accrue" on such bonds. And it may be regarded as tolerably well settled in Kansas that the validity of all municipal bonds issued in aid of any mere private enterprise will be contested by tax-payers, if payment is attempted to be enforced, and that when contested they will be adjudged to be void.                             W. C. W.

that the above-mentioned act of February 23, 1871, is unconstitutional; 1st, Because it is a *special* act conferring upon the city of Iola corporate powers; 2d, Because it undertakes to authorize the levy and collection of taxes by the city authorities for *private* as distinguished from *public* purposes or objects. The case was heard upon the demurrer at the June Term 1873, and was decided June 6th.

*Alfred Ennis,* for plaintiff.

*McComas & McKeighan,* for defendant.

The opinion of the court was delivered by

DILLON, *Circuit Judge:* Without express legislative authority the city of Iola would have no power to appropriate money or to loan its credit to aid private persons to establish manufactories either near to or within the corporate limits. This proposition admits of no dispute, and is well settled. *Stetson v. Kempton,* 13 Mass., 278; *Cushing v. Newburyport,* 10 Met., 510; *Cook v. Manufacturing Co.,* 1 Sneed, (Tenn.) 698; *Penn. Railroad Co. v. Philadelphia,* 47 Penn. St., 189; Dillon's Munic. Corp., § 106. No precedent authority, either by general or special act, was conferred upon the city to pass the ordinance to provide for the holding of the election to determine whether the citizens would extend the proposed aid to the Bridge Manufactory and Foundry. The adoption of the ordinance and the holding of the election were without color of law. But subsequently the legislature passed the act mentioned in the statement of the case, which undertook to legalize the election, and to authorize the issue of the bonds in question. The bonds were issued under the authority of this act, and so the declaration alleges. Their binding obligation upon the municipality depends upon the validity of this enactment, and the question of its validity is raised by the demurrer to the declaration.

Against the act two objections are urged in argument: 1st, That it contravenes certain special provisions of the constitution of the state. 2d, That it authorizes the levy and col-

lection of taxes for objects or uses not within the scope of the taxing power. The act whose constitutionality we have to determine purports to legalize the prior election in Iola and to authorize the issue of bonds pursuant to that election. If the legislature might have passed such an act prior to the election, it will not be disputed that it can ratify and confirm an election held without it; but the legislature, it is clear, cannot do by a curative or retrospective act what it could not have previously authorized. (Cooley, Cons. Lim., 281.) The act, which was passed and which went into effect February 23, 1871, after reciting the election and legalizing it, authorizes the city to appropriate $50,000 to aid in the erection and equipment of buildings at or near Iola, to be used for the purpose of manufacturing bridges, plows and stoves, and to issue and deliver the bonds of the city, with coupons attached, payable in fifteen years, and enjoins that it shall levy and collect taxes to pay the principal and interest of the bonds. It is objected that this act violates § 1 of article 12 of the constitution of the state, which provides that the legislature shall pass no *special* act conferring corporate powers. That the act in question is a special act is so plain as not to justify extended discussion. It is not only limited in its application to the city of Iola, but to a single election, and the issue of specific bonds. Never was an act more manifestly special. It seems to me to be almost equally clear that it is an act which undertakes to confer upon the city *corporate powers.* It ratifies an election held by the city, and authorizes it to do what, without an express grant, no municipality can do, namely: to issue bonds in aid of a manufacturing enterprise, and to levy and collect taxes to pay such bonds. If the power to create a debt binding upon the municipality, and to lay burdens upon all the property within it to pay the debt created, is not a corporate power, it is difficult to conceive what could justly be regarded as such. The powers given by the terms of the act under discussion are the most important of any which can be conferred upon municipal corporations. They

1. Legislative powers; curative acts.

2. Special acts, conferring corporate powers are void.

are, indeed, precisely the powers the exercise of which is most to be feared, and which were particularly liable to be unwisely conferred by special legislation. If this prohibition in the constitution (§ 1, article 12) applies to municipal corporations, the special act in question plainly contravenes it. Whether the 12th article of the constitution of Kansas quoted in the statement of the case was designed to apply to municipal corporations might admit of some discussion if the question were *res nova*. This article is taken from the constitution of Ohio.* And the supreme courts, not only of that state, but of Kansas, have, upon full consideration, repeatedly decided that it did include municipal corporations. *Atchison v. Bartholow*, 4 Kas., 124; *Wyandotte City v. Wood*, 5 Kas., 603; *The State v. Cincinnati*, 20 Ohio St., 18, following *Atkinson v. Railroad Co.*, 15 Ohio St., 21. In the case first cited, the supreme court of the state of Kansas held that the constitution compelled the legislature to regulate the grant of powers to municipal corporations by *general* laws; and hence a *special act*, or an act specially amending the charter of the city of Atchison, in respect to making local improvements and local assessment, was void. In the case next cited (*Wyandotte v. Wood*,) the same court adhered to this view, and accordingly held that an act of the legislature specially extending the limits of the city of Wyandotte was unconstitutional, because it contravened both sections one and five of article 12 of the constitution. So, in the case of *The State v. Cincinnati*, above cited, the supreme court of Ohio, under the same constitutional provisions, held that the legislature cannot by special act create a corporation; nor by special act confer additional powers on a corporation already existing, and that in these respects there was no difference between private and municipal corporations, since the constitution equally embraced and equally applies to both classes; and therefore the act of April 16, 1870, "to prescribe the corporate limits of Cincinnati," being consid-

[*Sections 1 and 2 of article 13 of the constitution of Ohio is the same as § 1, article 12, of the constitution of Kansas. Sec. 6, article 13, of the Ohio Constitution, is the same as § 5, article 12, of the Kansas Constitution.]

ered a special·act, was adjudged void. See also *Atkinson v. Railroad Company*, supra. In this last case, Ranney, J., thus expounds the constitution: "These provisions of the constitution are·too'explicit to admit of the 'least doubt that they were intended to disable the general assembly from either creating corporations, or conferring upon them corporate powers, by *special* acts of legislation. It was intended to correct an existing evil, and to inaugurate the policy of placing all corporations of the same kind upon a perfect equality as to all future grants of power; of making such law applicable to all 'parts of the state, and thereby securing the vigilance and attention of its whole representation; and finally, of making all judicial construction of their powers, or the restrictions imposed upon them, equally applicable to all corporations of the same class. We must give such a construction to the constitution as will preserve its leading objects intact." One of these objects in Kansas, as well as in Ohio, was to cut up by the roots the mischief of special legislation, particularly in respect to corporations, both public and private. The object would be defeated if the special act relating to the city of Iola could stand. If under the doctrine of *Butz v. Muscatine*, 8 Wall., 575, this court is not absolutely bound, in this class of cases, to follow the interpretation of the state constitution given by its highest court, yet it seems that it ought to follow it where it appears to rest upon solid grounds, and was made in cases and in respect to questions where there was nothing to warp the judgment of its judges, and where the interpretation was settled or had been declared at the time the act in controversy was passed. In the latest case on this subject, decided by the supreme court of the United States, it is not denied that the supreme court of a state is the appointed expositor of its constitution and laws, and that the federal courts will adopt as rules for their own judgments the decisions of the highest courts of the state "respecting local questions peculiar to itself, or respecting the construction of its own constitution and laws." It only denies the binding force of state adjudications which rest upon the general prin-

ciples of law, and not upon the meaning of special constitu-
tional or legislative provisions.    *Olcutt v. Supervisors*, U. S.
Supreme Court, Dec. Term 1872.    I think the present case is
one in which it is the duty of this court to follow the decisions
of the state supreme court; and so far as my decision rests
upon the special provisions of the constitution above referred
to, I place it upon the state adjudications without an inquiry
into their soundness.

But suppose the enactment under which the bonds in ques-
tion were issued is not "a special act conferring corporate
powers," within the meaning of the constitutional prohibi-
tion, the other objection made to the validity of the bonds
remains to be considered.    The act authorizes the creation of
a debt by the municipality to raise money by the issue of bonds
to be given as a donation or bonus "to aid in the
erection and completion of buildings at or near the
city of Iola to be used for the purpose of manufac-
turing Z. King's patent bridges, and as a foundry, and iron
works;" and the act also authorizes and requires the levy and
collection of such taxes as may be necessary to pay the inter-
est and principal of these bonds.    It is important to be observed
that this is undeniably a private enterprise.    These buildings
and works are the private property of the owners.    No public
or municipal control over this property or the enterprise aided
is specially reserved or provided for, and none exists different
from that which exists as to all other property owned by private
persons and devoted to private uses.    The proprietors of these
works are under no obligation, by reason of the aid extended,
and the burden of taxation thereby imposed upon the muni-
cipality, to render it or the state any duty or service whatever
—not even to repay the loan, or to maintain for any specified
time the contemplated manufacturing enterprise.    The state
or city could not compel them to complete or operate the
works, or prevent their removal at pleasure to some other
locality.    And thus we have presented the inquiry, than
which no question concerning the property-rights of the citi-
zen is of more transcendent moment, viz.: Whether the

*Marginal note:* 3. Taxation in aid of private enterprises is illegal.

legislature may thus compel or coerce the citizen to aid in the establishment of purely private enterprises or objects, because these will or may incidentally promote the general good of the community or locality.   I think it safe to affirm that no such principle has yet received judicial sanction.   On the contrary, the principle has been declared unsound by courts of the highest respectability.   The general subject of the extent of the taxing power in connection with municipal aid to railways has been thoroughly discussed in a majority of the states of the Union, and recently by the supreme court of the United States.   (*Olcutt v. Supervisors*, and *Railroad Co. v. Otoe County*, December Term 1872.)   The courts everywhere have agreed that taxes can lawfully be imposed for public purposes only; and therefore, in the language of Chief Justice Black, "The legislature has no constitutional right to create a public debt or authorize any municipal corporation to do it, in order to raise funds for a mere private purpose.

**4. Purposes of taxation; legislative power.** No such authority passed to the assembly by the general grant of legislative power.   This would not be legislation.   Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation and becomes plunder.   Transferring money from the owners of it into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional, for all the reasons which forbid the legislature to usurp any other power not granted to them. * * * An act of the legislature authorizing contributions to be levied for a mere private purpose, or for a purpose which though it be public is one in which the people from whom they are exacted have no interest, would not be a law, but a sentence commanding the periodical payment of a certain sum by one portion or class of people to another. The power to make such order is not legislative but judicial, and was not given to the assembly by the general grant of legislative authority." *Sharpless v. Philadelphia*, 21 Penn. St., 147.   Similar language is held by Mr. Justice Strong in

delivering the opinion of the supreme court of the United States in the recent case of *Olcutt v. Supervisors of Fond du Lac County*, December Term 1872.   The learned Justice there says, that "The taxing power of the state extends no further than to raise money for a public use, as distinguished from private, or to accomplish some end public in its nature." Again, he says: "No one contends that the power of a state to tax, or to authorize taxation, is not limited to the uses to which the proceeds may be devoted.   Undoubtedly taxes may not be laid for a private use."   (See *Freeland v. Hastings*, 10 Allen, 570; *Tyson v. School Directors*, 51 Penn. St., 9.)

The only question therefore is, whether the use for which taxation in the present case is authorized is a public or a private use.   The supreme court of the United States in sustaining the validity of legislative acts authorizing municipal aid to railways, place it upon the distinct ground that highways, turnpikes, canals, and railways, although owned by individuals under public grants, or by private corporations, are *publici juris;* that they have always been regarded as governmental affairs, and their establishment and maintenance recognized as among the most important duties of the state, in order to facilitate transportation and easy communication among its different parts. *Rogers v. Burlington*, 3 Wall., 654; *Mitchell v. Burlington*, 4 Wall., 270; *Railroad Company v. Otoe County*, supra.   Therefore it is, that in favor of such improvements the state may put forth its right of eminent domain, and also as now established by judicial decisions, unless the right be denied in the constitution, its power to tax.   That these acts may lawfully be done is, because, and only because, the use is a public one, public in its nature, and hence these works are subject to public control and regulation, notwithstanding they may be constructed under legislative authority, and exclusively owned by private persons or corporations.   Compulsory taxation in favor of railways, and like public improvements owned by individuals or companies, is an exercise of power going quite to the verge of legislative authority. Although it is a doctrine that must now be considered as

judicially settled, still it is one which has encountered a vigorous opposition, both on the ground of expediency and of power, and the exercise of the authority has been so disastrous as already, in some of the states, to have led to constitutional provisions for the protection of the citizen. But it is obvious, from the statement of the grounds upon which such legislation rests, that it furnishes no support for the validity of taxation in favor of enterprises and objects essentially private; and such I consider to be the establishment of a bridge manufactory or foundry owned by private individuals. Cases may be imagined giving rise to doubts, whether the use be public or private; but the one in hand does not seem to be difficult to class. It is certainly not usual for the legislature to undertake to exercise the right of eminent domain to procure sites for hotels, banks, manufactories, stores and the like, and it may be safely said, unless extraordinary circumstances may occasionally furnish an exception, that private property cannot lawfully be condemned for such purposes; and the reason is, that it would not be a taking for public use, nor justified by any reasonable necessity. So taxation to aid ordinary manufactories, or the establishment of private enterprises, is a thing until recently quite unheard of; and the power must be denied to exist, unless all limits to the appropriation of private property, and to the power to tax, be disregarded. The question under discussion must be determined upon some principle, and I hold it to be sound doctrine that the mere incidental benefits to the public or the state, which result from the pursuit by individuals of ordinary branches of business or industry, do not constitute a public use in the sense which justifies the exercise of either the power of eminent domain or of taxation. If this salutary principle be abandoned, we unsettle the foundations of private property, and unwisely open the door for frauds and abuses of the most alarming character.

That their views are sound, I entertain no doubt, but my conviction of their soundness has been much strengthened by the recent decision of the supreme judicial court of Massa-

chusetts, declaring unconstitutional the act authorizing the issue of what is known as the "Summer Street Fire Bonds." In November 1872 a considerable portion of the city of Boston was destroyed by fire. In December following the legislature empowered the city to issue bonds to the amount of twenty-five millions of dollars, the proceeds of which three commissioners appointed by the mayor were authorized to loan in a safe and judicious manner, "in such sums as they shall determine to the owners of land, the buildings upon which were burned by the fire in said Boston, on the 9th and 10th days of November 1872, upon the notes or bonds of said owners secured by first mortgages of said land; said mortgages to be conditioned that the rebuilding shall be commenced within one year from the first day of January 1873, and said commissioners to have full power to apply the proceeds of said bonds in making said loans in such manner, and to make such further provisions, conditions and limitations in reference to said loans and securing the same, as shall be best calculated, in their judgment, to insure the employment of the same in rebuilding upon said land burned over, and the payment thereof to the said city." In the late case of *Lowell, et al., v. Boston,* the constitutionality of this act was the question to be decided. It will be seen that the object of this act, as shown by its provisions, was "to insure the speedy rebuilding on land the buildings upon which were burned" by the great fire; and the question was, as to the right of a state to impose any taxes for this object, and this depended upon the further question whether this object was, in a legal sense, a public object. The court distinctly held, to use the language of the rescript sent down in the case, that taxes can only be laid "for some public service, or some object which concerns the public welfare;" that "the preservation of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is in its essential character a private and not a public object;" "that the incidental advantages to the public or to the state which result from the promotion of

private interests, or the prosperity of private enterprises or business, does not justify their aid by taxation;" "that as a judicial question the case is not changed by the magnitude of the calamity which has created the emergency." And finally the court say, "The expenditure authorized by this statute, being for private and not for public objects, in a legal sense, it exceeds the constitutional power of the legislature, and the city cannot legally issue the bonds for the purposes named in the act." See also as to distinction between public and private use: *Bloodgood v. Railroad Co.*, 18 Wend., 65; *Allen v. Inhab. of Jay*, Maine Sup. Court, July Term 1871; *Jenkins v. Andover*, 103 Mass., 94, holding invalid a statute authorizing taxation in favor of a private incorporated academy. Same principle: *Curtis v. Whipple*, 24 Wis., 350; *People v. Salem*, 20 Mich., 452.

As the only authority for the issue of the bonds in question was an unconstitutional act of the legislature, they are void —void from the beginning, and void into whosesoever hands they may have come. All persons must at their peril take notice of the *power* of municipal corporations or officers to issue securities, and especially is this so where the want of power results from constitutional prohibitions or provisions. *The Floyd Acceptances*, 7 Wall., 676; *Marsh v. Fulton Co.*, 10 Wall., 676; *Clark v. Des Moines*, 19 Iowa, 199; *Steines v. Franklin Co.*, 48 Mo., 167.

The demurrer to the declaration is sustained; and unless the plaintiff desires to amend, judgment will be entered for the defendant.

And judgment final was entered for defendant.