Cheshire,
April 8, 1929.

EYERS WOOLEN COMPANY *v*. GILSUM.

*Philip H. Faulkner* and *Henry C. Arwe*, for the plaintiff.

*Orville E. Cain*, for the defendant.

PEASLEE, C. J. The transferred case states the issue to be the validity of Laws 1925, chapter 297, which reads as follows: "Section 1. That the town of Gilsum in Cheshire county be authorized to exempt from taxation for a term of not more than ten years a new woolen mill and the machinery to be installed therein proposed to be erected in said town by or for the Eyer Woolen Mill."

I. It is claimed that the selectmen in making the assessment acted as agents of the town, and that as such agents their authority was limited by the exempting vote. Therefore, it is said, they possessed no authority to lay a tax upon the plaintiff's mill, and the assessment is void. One answer to this is that it is well settled here that in assessing taxes selectmen act in a judicial capacity, and not as agents of the town. *Edes* v. *Boardman*, 58 N. H. 580; *Boody* v. *Watson*, 64 N. H. 162; *Canaan* v. *District*, 74 N. H. 517, 535.

Whether, in the exercise of this judicial function, they are bound to follow the directions given by illegal votes or unconstitutional statutes, as has sometimes been suggested (see *Boody* v. *Watson*, *supra*, 167), is not material here. On this petition for abatement the plaintiff is entitled to such relief only as justice requires. P. L., *c.* 64, *s.* 14; *Connecticut Valley Lumber Co.* v. *Monroe*, 71 N. H. 473, 479, and cases cited.

If the jurisdiction of the selectmen, acting as assessors, was limited as above suggested, that of the court has no such boundary. The constitutional right of the taxpayers of Gilsum, that the plaintiff pay its constitutional share of the public expense, is capable of vindication here, if not in the court of original assessment. *Boody* v. *Watson*, *supra*.

"However erroneous, in law or in fact, the assessment may be, the appeal being an equitable proceeding, and the appellant, seeking equity, being required to do equity, only so much of his tax is abated as in equity he ought not to pay. *Perry's Petition*, 16 N. H. 44, 48.

This is necessarily so because the statute commands such order to be made as justice requires; and justice requires such an order as will not relieve the appellant from bearing his share of the common burden of taxation on account of any error in the process of finding the amount of his share, and setting it down, with his neighbors' shares, on a town book." *Edes* v. *Boardman*, 58 N. H. 580, 586.

The further suggestion that the exemption does not infringe any constitutional right of the town, because "There is no such right" (*Canaan* v. *District*, 74 N. H. 517, 535), is sound (*Keene* v. *Roxbury*, 81 N. H. 332, 334); but it does not dispose of the case. "But while no rights of the town are infringed by the exemption . . . the constitutionality of the exemption, as infringing constitutional rules of uniformity and equality and general legislation as to the individual taxpayers of the town, remains to be considered." *Canaan* v. *District*, *supra*, 537.

Nor does this case come within the rule that there is no authority to tax property exempted by act of the legislature, even if the exempting act is void (*Canaan* v. *District*, *supra*, 540 *et seq.*). That rule is based upon the principle that in matters of taxation the constitution is not self-executing, and legislative authority to lay any tax is required. It does not apply here, because there is a general law covering the taxation of such property as the plaintiff holds. If the special exemption is void, a tax is authorized and required under the general law. The discussion of this topic in that case has to do with classes of property. "If we assume the action of the legislature to have been unconstitutional because of a failure to tax all classes of property, the unconstitutional action of the legislature in refusing or neglecting to provide for the taxation of certain classes of property would not authorize the court to invade the domain of the legislature and order the taxation of such property." *Ib.*, 541. The general legislative purpose to tax this class of property is plainly expressed. Its efficiency is not impaired by an unconstitutional special act relating to a specific piece of property within that class.

If the rule were otherwise, a most extraordinary situation would result. If this special act could be dealt with only upon the basis that it is an essential part of the general law taxing mills and machinery (P. L., *c.* 60, *ss.* 5, 6), its invalidity would require a holding that the whole law, of which it was an essential part, is invalid for lack of uniformity. The absurdity of such a conclusion is strong evidence of a different legislative intent. The legislative purpose is not doubtful. The provision for taxing mills and machinery was not designed to

be made dependent upon the validity of this exempting act. The special act was an independent piece of legislation, standing or falling according to its own merits. If invalid, it simply leaves the general law upon the subject to be administered as though the special act had never been passed. The legislative intent to tax mills, independently of what becomes of this exemption, and to tax this particular mill, if the exemption act is invalid, is too clear to admit of any doubt. "It is universally held that a valid act is not affected by the enactment of a void amendment, even if there are words of express repeal, unless it is clear the legislature intended such repeal." *Williams* v. *State*, 81 N. H. 341, 353. The doctrine is reaffirmed in *Foster* v. *Farrand*, 81 N. H. 448, 451.

II. It is urged on behalf of the plaintiff that since it accepted the offer of the town, made in pursuance of the act, and erected its mill upon the faith of the promised exemption, the town cannot now be heard to deny the validity of the legislation under which the parties acted. The *Opinion of the Court*, 58 N. H. 623, is relied upon as authority. That opinion in turn is based upon federal authorities, wherein it is held that when a state constitution has been given a certain construction those who have acted thereon are protected by the federal guaranty of the sanctity of contract obligations against a change in such interpretation. In accordance with this rule the justices advised the house of representatives, that General Laws, chapter 53, section 10, providing that towns might exempt certain new industries from taxation, was binding upon towns which had theretofore so voted, if the vote had been acted upon. The reason assigned for this conclusion was that there had been a practical construction of the constitution recognizing the validity of such legislation, and that the federal rule forbade a change of interpretation to the disadvantage of those relying thereon.

This conclusion disposed of existing exemptions. But it did not answer the question which had been asked, nor define the status of future exemptions. As to future transactions, the house was advised that the same rule would continue to apply; and an answer to the question was withheld, as the time available for investigation was insufficient for a proper consideration of the subject.

It may well be doubted whether the advice as to the future was sound. Whether the earlier reliance upon a practical construction which was not then known to have been questioned, might reasonably be continued after the issue had been raised, and expression of opinion upon it withheld because of the difficulties involved in its solution, is

at least debatable. In the ordinary affairs of life one could hardly stand upon such a proposition.

But since the justices stated that such would be its effect, reliance could be put upon their statement as it had theretofore been put upon practical construction, and a like result could be obtained.

It is presumably for this reason that, in the cases involving these exemptions which have since arisen, the issue of constitutionality has not been considered. An examination will show that in the only cases where the exemption was treated as valid the required action relying upon the vote had been taken by the exempted party. "It is admitted that the improvements are exempted . . . under the vote. The question submitted is, whether the real estate is also exempted." *Franklin Needle Company* v. *Franklin*, 65 N. H. 177, 178. In *Bean & Symonds Co.* v. *Jaffrey*, 80 N. H. 343, the plant was erected after the vote, and was not taxed for seven years.

In the present case the question arises as to the circumstances which will support the claim of reliance upon an existing understanding as to the validity of a statute. The essential facts are stated in the briefs of the respective parties. The plaintiff alleges erection of its mill after the vote of the town; and the defendant replies, that before this was done the tax commission notified all interested parties that the commission deemed the act to be unconstitutional. Neither party has denied the correctness of the other's allegations, and for the purposes of this decision they are taken to be true.

The statement in the *Opinion of the Court*, 58 N. H. 623, 625, that "So long as the existing laws remain unrepealed, and the constitutional construction heretofore adopted remains unchanged, contracts hereafter made under those laws and that construction will be valid," is not to be taken in an unlimited sense. In order that the compact shall be thus beyond investigation, it must have been made in honest and reasonable reliance upon the stability of the construction of the constitution and the consequent validity of the laws.

The ground for denying to a governmental agency or its taxpayers the right to raise the question of constitutionality is the doctrine of equitable estoppel. "The construction, settled in this state by universal understanding and usage, applies the doctrine of equitable estoppel to such partial and temporary relinquishments of legislative power as have heretofore been made and acquiesced in. When an express promise of exemption from taxation for a term not exceeding ten years (58 N. H. 624; *State* v. *U. S. & Canada Express Co.*, 60 N. H. 219, 259; *Boody* v. *Watson*, 63 N. H. 320) has induced the promisee

to make an investment which the promisors desired him to make, he cannot be defrauded by a repudiation of the promise. If any of the promisors deny the authority of their agents to make the exempting bargain with him, their objection should be seasonably presented for enforcement by an adjudication of the rights of both parties that will prevent his relying upon a promise judicially decided, or universally believed to be valid. When their silence and apparently unanimous assent have led him to change his position, and won for them the stipulated benefit of the investment made by him on the faith of the exempting agreement, they cannot contest their agents' authority to make the agreement. The public and every individual, and all corporations, public and private, are held to one standard of probity. Neither the state nor a municipality can gain an unfair advantage from the promisee's ignorance of law by postponing, till his investment is completed, an objection which is unseasonable after they receive the benefit of their agents' unauthorized contract, and which an honest man, in their situation, would raise before that time or never. Whether this is or is not a sound construction of the constitution we need not inquire. It has been settled too long to be disturbed, and is too firmly planted in moral principle to excite a desire for its reversal, but it cannot be extended beyond cases of equitable estoppel. It detracts nothing from the necessity of strong evidence to show an intention of the legislature to exercise a releasing power which they do not possess, and which cannot be sustained against a seasonable objection." *Dow* v. *Railroad*, 67 N. H. 1, 49, 50.

One essential element for such reliance is the entire good faith and innocence of the party imposed upon. If he knows the representation is false, he has no standing. *Thompson* v. *Currier*, 70 N. H. 259, 266, and cases cited. If he is put upon inquiry, the result is the same. *Odlin* v. *Gove*, 41 N. H. 465, 474.

The claim here is that there was a legal reliance upon the proposition that as to the plaintiff there was no debatable question as to the validity of the law. But the plaintiff had seasonable information to the contrary. It was notified that the constitutionality of the statute was denied. This notice came from a proper source. The tax commission are the superior tax assessing authority, P. L., *c.* 68, *s.* 12. Notice from them of the position taken informed the plaintiff that the tax would be assessed, and it gave full opportunity to withdraw from the compact with the town before expenditures were made. Under these circumstances the plaintiff will not be heard to say that it relied upon the unquestionable validity of the act. It went ahead

with information to the contrary, and its rights are to be determined without any estoppel of the defendant or its taxpayers to set up the invalidity of the statute. The case calls for a decision of the question whether there is constitutional authority for granting the exemption here claimed.

III. "A general exemption is a law. A special exemption is a gratuity, or a contract made by authority of law. A general exemption is a part of the state policy of taxation. It is an exercise of the power of classification and may be changed at any time. *Brewster* v. *Hough*, 10 N. H. 138; *Franklin Street Society* v. *Manchester*, 60 N. H. 342. A special exemption is a favor granted to a particular party. If it contains the essentials of a contract, it cannot be impaired. *Opinion of the Court*, 58 N. H. 623." *Opinion of the Justices*, 82 N. H. 561, 572.

It is evident that the act here in question attempted to grant power to vote a special exemption. It was special to the last degree, for it related to one town only and to a single named party to whom the favor of exemption might be granted. Although it is thus highly specialized, it does not differ in principle from the favors conferred under the general law formerly in force. (P. S., *c.* 55, *s.* 11; G. L., *c.* 53, *s.* 10; G. S., *c.* 49, *s.* 9; Laws 1860, *c.* 2361.) The ultimate result of action under the earlier law was a specific exemption of a named individual taxpayer. It did not even authorize a town to make a general proffer of exemption to all of a class specified in the offer. *Franklin* &c. *Co.* v. *Franklin*, 66 N. H. 274.

Under either act, the exemption was to be individual, and the grant was to be by vote of the town. If such exemption could be sustained under a general law, it would be equally valid when conferred by virtue of a statute limiting the dispensing power to a single instance. In their ultimate operation one is as special and discriminatory as the other.

It is axiomatic that every exemption creates inequality of taxation. *Canaan* v. *Enfield*, 74 N. H. 517, 537, and cases cited; *Opinion of the Justices*, 82 N. H. 561, 570. Inequality caused by the exercise of the legislative power to select the classes of property which shall be taxed, and by granting general exemptions, has always been recognized as within the power conferred by the constitution. *Opinion of the Justices*, *supra*. But special exemptions, giving to one party an immunity from taxation not enjoyed by others similarly situated, have never been sustained upon these grounds.

The validity of a special exemption is not to be settled as a question

of taxation, but of the exercise of the protective power. *Canaan* v. *District*, 74 N. H. 517, 537.

Substance rather than form is the test. The net result of the transaction is to compel the other taxpayers of the town to contribute the plaintiff's taxes. It gives the town's money to the plaintiff as effectually as would a direct appropriation of the sum involved.

The question is definitely settled by the decisions. "And as anyone's payment of less than his share leaves more than their shares to be paid by his neighbors, his non-payment of his full share is a violation of their constitutional right.

"Such non-payment is, in effect, a compulsory payment of money, by those who bear their shares of the common burden, to the privileged person who does not bear his share. It is, in law and in fact, as much a subsidy, paid by the former to the latter, as if it were a subsidy in form and in name. The result is the same whether (1) a man pays his just tax of $10, and receives it back again, and his neighbors pay $10 more than their shares, or (2) they pay $10 more than their shares, and the ceremony of his paying $10 and receiving it back again is omitted, or (3) he and they pay their several shares, and they pay him $10. The first may be called a donation of a subsidy or bounty; the second may be called an exemption; the third may be called something else. They are three methods of doing one thing." *Morrison* v. *Manchester*, 58 N. H. 538, 549, 550.

"If assessors can be authorized to issue a warrant requiring the tax-collector to take from A $10 more than his share, and from B $10 less than his share, and pay the same into the public treasury, the same warrant can require the same collector to take from C and D their shares for the public treasury and the public use, and also to take $10 from C and give it to D for his private use. The difference between the case of A and B, and the case of C and D, would be a matter of immaterial form. . . .

"The payment of a bounty or subsidy out of the public treasury, by the protective power, may be made in the form and under the name of a tax exemption. . . . Tax exemption has been adopted as a method of expending public money. The protective power has been exercised by giving bounties of exemption from taxation, as well as by giving bounties of money obtained by taxation. The generation by whom the constitution was adopted understood the state could pay a sum of money to an individual, for a public purpose, by exempting him from the payment of the same amount of tax. They did not understand there would be any constitutional virtue in going through

the form of collecting money from him, and immediately paying it back to him. . . . The payment of bounties by tax exemptions, and the receipt of compulsory contributions under the protective power, though they affect the revenue, are not to be confounded with the operation of the tax power which collects the constitutional share of the expense of protection." *State* v. *Company*, 60 N. H. 219, 251, 252, 259, 260.

An unwarranted exemption is, "in effect, a payment to the Pillsburys [the exempted parties], for their private use, of their neighbors' money." *Boody* v. *Watson*, 64 N. H. 162, 167.

"It is undoubtedly true that all exemptions from taxation are practically equivalent to a direct appropriation." *Canaan* v. *District*, 74 N. H. 517, 537.

These cases establish the reasonable rule that by whatever means the result is accomplished, it is the result that is of controlling importance. A special tax exemption is one form of appropriating public money. As there is no "constitutional virtue in going through the form of collecting money from him and immediately paying it back to him," neither is the reverse of that proposition of any moment upon the issue of constitutional power. There is no constitutional virtue in discharging an obligation instead of granting a sum of money equal in amount. "When a part of a class of taxed property is exempt, the public dispenses with the circuity of taking money from the owner as his just tax, and returning it to him as a gratuity. The whole or a part of his tax-debt is collected from his neighbors. This cannot be done by New Hampshire taxation, which is an equal sharing of the public expense, and not a donation of subsidies to a part of a class of property owners out of the property of others. The direct or circuitous grant of bounties, when constitutional, is an exercise of the power of protection, the expense of which is equally divided by the tax power." *Morrison* v. *Manchester*, 58 N. H. 538, 550.

As an exercise of the protective power a special exemption must find its justification in some public purpose, or public use, which is to be promoted by the exempted enterprise. As to special exemptions "the element of some promotion of the public good, by the exercise of the protective power, is required." *Opinion of the Justices*, 82 N. H. 561, 572, 573.

IV. "When a pecuniary burden is imposed upon a citizen in the form of a tax, two questions may always be raised, — first, whether the purpose of such burden may properly be considered public, . . ." *Berlin Mills Co.* v. *Wentworth's Location*, 60 N. H. 156, 157.

Was the promotion of the plaintiff's business a public use or public purpose, for the support of which a tax could be laid or an appropriation of public money made? In a few jurisdictions it has been treated as though it were of that character. That conclusion was reached in Rhode Island, largely upon the ground that the constitution of the state did not limit the taxing power, and that therefore a special exemption was valid. *Crafts* v. *Ray*, 22 R. I. 179. Another argument advanced in this case is that as new investments only are exempted, other taxpayers' taxes are not increased, since without the exemption the new property would not be constructed and therefore would not be available for taxation. This argument is plainly unsound. Taxes are levied to supply the public needs of the community. The larger the community the greater the need and the more the money that must be raised by taxation. New factories entail the need of more fire and police protection and quite likely added streets, sewers, etc. "A man's tax is his share of expense incurred by him and the other members of the community for a public purpose, and his and their common benefit." *Robinson* v. *Dover*, 59 N. H. 521, 526.

It is to be noted that it was also said by the Rhode Island court, in the case cited above, that the court would agree to the general proposition that statutes are invalid "which authorize direct aid to private affairs, and . . . which violate some express or evident restriction of the constitution." *Ib.*, 188.

In *Colton* v. *Montpelier*, 71 Vt. 413, an exemption like the one here involved was upheld upon the ground that the legislature had full power to determine what property should be exempt from taxation. No distinction is there made between general and special exemptions, and the subject is not mentioned. Upon the theory of that case, the issue of what is a public use would not be involved, and the case is not an authority upon that question, although it has sometimes been cited as having passed upon that topic.

Opposed to whatever of authority is to be found in these cases, there is a large body of precedents denying the legislative power to tax for the purpose of aiding purely private enterprises, either as going concerns or to secure new industries for the community.

"But in the case before us, in which the towns are authorized to contribute aid by way of taxation to any class of manufacturers, there is no difficulty in holding that this is not such a public purpose as we have been considering. If it be said that a benefit results to the local public of a town by establishing manufactures, the same may be said of any other business or pursuit which employs capital or

labor. The merchant, the mechanic, the inn-keeper, the banker, the builder, the steamboat owner are equally promoters of the public good, and equally deserving the aid of the citizens by forced contributions. No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two thirds the business men of the city or town." *Citizens &c. Ass'n* v. *Topeka*, 20 Wall. 655, 664. "It is taxation which takes the private property of one person for the private use of another person." *Parkersburg* v. *Brown*, 106 U. S. 487, 501.

The nature of the business undertaken is in no sense public. "It is a private undertaking for private business and profit. The use of it to the public is secondary to that, and tributary to that; the benefit to the public is remote and consequential. . . . Any such enterprise tends indirectly to the benefit of every citizen by the increase of general business activity, the greater facility of obtaining employment, the consequent increase of population, the enhancement in value of real estate and its readier sale, and the multiplication of conveniences. But these are not the direct and immediate public uses and purpose to which money taken by tax may be directed." *Weismer* v. *Douglas*, 64 N. Y. 91, 101, 103.

Similar quotations from other jurisdictions might be multiplied. *Allen* v. *Jay*, 60 Me. 124; *Brewer Brick Co.* v. *Brewer*, 62 Me. 62; *Brownville* v. *Company*, 123 Me. 379; *Coates* v. *Campbell*, 37 Minn. 498; *Minnesota Sugar Company* v. *Iverson*, 91 Minn. 30; *Clee* v. *Sanders*, 74 Mich. 692; *Michigan Sugar Company* v. *Auditor General*, 124 Mich. 674; *English* v. *People*, 96 Ill. 566; *Mather* v. *Ottawa*, 114 Ill. 659; *Oxnard &c. Company* v. *State*, 73 Neb. 57; *National Bank* v. *Iola*, 9 Kan. 689; *McConnell* v. *Hamm*, 16 Kan. 228; *People* v. *Parks*, 58 Cal. 624.

Although this precise question does not appear to have arisen in Massachusetts, yet the decision in *Lowell* v. *Boston*, 111 Mass. 454, covers substantially the same ground. The question of public use is there dealt with very fully and convincingly, and the conclusion reached would include a holding that aiding private manufacturing enterprises is not a public purpose.

In considering the situation where a town voted a second ten year exemption to a manufacturer, and the remedy for correction of the unauthorized vote, it was said: "The Pillsburys' non-payment of their statutory share would be a compulsory payment of that share by their neighbors, and, in effect, a payment to the Pillsburys, for their private use, of their neighbors' money." *Boody* v. *Watson*, 64

N. H. 162, 167. If the payment would be for their private use under those circumstances, it is not perceived how it would be any the less of that character if made under a first ten year bounty. The use to be made of the benefit conferred would be the same in both cases. Being private, it would not be public.

But it is said that the holding that the exercise of right of eminent domain under the flowage act is constitutional (*Great Falls Mfg. Company* v. *Fernald*, 47 N. H. 444; *Ash* v. *Cummings*, 50 N. H. 591; *Amoskeag Mfg. Co.* v. *Head*, 56 N. H. 386) establishes for this state the rule that the promotion of manufacturing is a public purpose, and that therefore it is a proper object of public financial aid.

There has been no little diversity of opinion as to whether the public use for which the right of eminent domain could be used was the same as the public purpose for which taxes might be laid. "So far as respects the use, the taking of private property by taxation is subject to the same limitation as the taking by the right of eminent domain. Each is a taking by the State for the public use, and not to promote private ends." *Cole* v. *Le Grange*, 113 U. S. 1, 8. Suggestions to the same effect were made in *Perry* v. *Keene*, 56 N. H. 514, 540.

On the other hand, it is stated in Cooley on Taxation, *p.* 76, that the public use is broader in eminent domain than in taxation. This view was adopted recently by the supreme court of the United States, the reason assigned being that compensation is made for taking under eminent domain. *Wolff &c. Co.* v. *Industrial Court*, 262 U. S. 522, 527.

In another work, Judge *Cooley* states that "Taxation and eminent domain indeed rest substantially on the same foundation, as each implies the taking of private property for the public use on compensation made; but the compensation is different in the two cases." 2 Cool. Const. Lim. 1055. These citations fairly illustrate the difference of opinion expressed in the numerous instances where the question has been considered. None of them contain any suggestion that the use is broader in the field of taxation than in that of eminent domain. The most that can be claimed in favor of the argument now under consideration is that the two are equal.

Assuming that the suggested distinction, giving eminent domain a broader scope for operation than is accorded to the imposition of taxes, is not to be sustained, the question of applying the flowage law cases to comparable situations as to taxation is to be considered. While those cases have been consistently followed here, it has been upon the principle of *stare decisis*, and not because the decisions were intrinsically sound.

"In speaking of the mill act, *Ladd*, J., said in *Salisbury Mills* v. *Forsaith*, 57 N. H. 124: 'I agree with counsel for the defendant that the act goes to the verge of the constitutional power of the legislature, and I may say that, but for the authorities by which the court thought they should be governed in the late case of *Amoskeag Co.* v. *Head*, I should find great difficulty in sustaining it.' See, also, the remarks of the same judge in the case referred to, 56 N. H. 400. The courts of other states have given a like interpretation to similar provisions of their constitutions with reference to flowage. Lewis, in his work on eminent domain, after reviewing the decisions, concludes that 'the only possible basis upon which the mill acts can stand is that mills are a public use, within the meaning of the constitution'; and that 'this can only be true of that class of mills which are obliged to serve the public, and, unless the acts are limited to such mills, they cannot be sustained.' Lewis, Em. Dom., *ss.* 178–183. It would seem, therefore, that the doctrine of *Great Falls Mfg. Co.* v. *Fernald*, and like cases, is *sui generis*, and is not applicable to the full extent of its import in cases other than those specially relating to the taking of flowage rights. These cases cannot be regarded as deciding that 'public use' in the bill of rights is synonymous with public benefit, public advantage, or any use that is for the benefit and welfare of the state. Whatever was said by *Perley*, C. J., in the Fernald case, having a tendency to show that such was his view, must be understood as having reference to the facts of that case, and not as expressing a general rule to be applied whenever the question of public use arises." *Rockingham &c. Co.* v. *Hobbs*, 72 N. H. 531, 533, 534.

If it were true that the flowage cases establish a general rule that whatever indirectly tends to promote the welfare of the community is a public purpose for which taxes could be laid, it would follow that donations to educational institutions not obligated to serve the public would be valid. The contrary holding in *Holt* v. *Antrim*, 64 N. H. 284, shows that the supposed rule is not recognized in this jurisdiction. That case involved a vote of the town, under a special act of the legislature, to appropriate money to erect a school building for a private academy, the same to be held under a perpetual lease, without payment of rent. In sustaining the action as a valid appropriation of the proceeds of taxation, it was held that the academy would take the building as a trustee, charged with a public duty to use the same for the public purposes to which it was dedicated. All this was implied, and the implication was drawn from the necessity for finding some legal ground for holding the appropriation to be

valid. The act "is to be so construed, if it reasonably may be, as to be consistent with a presumed legislative intent not to give an unconstitutional and void sanction to taxation for a private purpose." *Ib.*, 286. The trust duty was implied because an appropriation without that duty would be invalid. "A reservation of all rights necessary to make this Antrim appropriation a constitutional expenditure of public money is naturally and reasonably implied. The corporation accepting the lease will accept it with the legal construction, and subject to all the conditions, necessary to give validity to the statute and the lease." *Ib.*, 287. Stated in direct terms, the holding is that an unrestricted gift of public money to an educational institution is invalid. *Brooks* v. *School District*, 73 N. H. 263. If educational institutions do not perform a public service to such an extent that general gifts to them can be sustained as appropriations for a public use, much less can a gift to a manufacturing corporation be so sustained.

That the theory of the flowage cases is not to be extended, even to other instances of taking property under the power of eminent domain, is shown by *Rockingham &c. Co.* v. *Hobbs, supra.* In that case legislative authority to confer such power upon a company generating, using and selling electric current was challenged. The flowage cases were relied upon by the company to sustain the grant of power. This claim was denied by the court, for the reasons hereinbefore stated. The rule is not to be extended, or applied to other situations.

And here again the conclusion that the mere distribution of electricity is not a public use or purpose, and that *quasi* governmental privileges cannot be conferred upon such a company if it remains a strictly private corporation, is authority denying the existence of the element of public use in the case of any private manufacturing corporation.

The implication in the *Antrim* case that the academy would make itself a trustee for the public purpose of education by accepting the lease, and in the *Rockingham Company* case that the company would elect to become a public utility by accepting and using the power of eminent domain, cannot be applied here. There is nothing of a public or governmental nature in what the plaintiff is doing. It is private business, conducted for purposes of private gain. It has no other object or effect.

The legal proposition upon which these cases rest "is not that some public benefit indirectly accruing from a private use of the land is a public use of it . . . but that by the exercise of the power of eminent

domain the public acquire a right." *Holt* v. *Antrim*, 64 N. H. 284, 287. The same principle was applied in *Brown* v. *Cemetery*, 78 N. H. 387, and *McMillan* v. *Noyes*, 75 N. H. 258, 263. Wherever this feature is lacking, it follows that there is nothing upon which to base a claim that the purpose is public. Such is the present situation. There is no public right, direct or indirect. There is no trust imposed upon the donation. Neither the use nor the distribution of the plaintiff's property is in any way limited or affected by the gift made by the town.

"The right to exercise the power of taxation in aid of the manufacturing enterprises of private persons or corporations has seldom been asserted and whenever asserted has been most emphatically denied." 1 Cool., Tax. (4th ed.), *s.* 221. See also note by Judge *Redfield*, 12 Am. Law Reg. (N. s.) 493; Black, Const. Law, 458.

Whether the question is considered upon the local decisions, or upon the authorities generally, or as an original proposition, the result is the same. Aiding a private manufacturing corporation is not a public purpose.

V. The Vermont view that the matter is to be disposed of as presenting merely a question relating to the general power to exempt from taxation, fails to take into account the doctrine of equality which is in force here. "All taxation must be equal." *State* v. *Pennoyer*, 65 N. H. 113, 114. The cases there cited illustrate the great variety of situations to which the rule has been consistently applied.

The undoubted rule that the legislature may tax some property and exempt other property, is based upon the proposition that the constitution confers legislative power to select the objects for taxation by a process of reasonable classification. Such classification "is a part of the state policy of taxation." *Opinion of the Justices*, 82 N. H. 561, 572, and cases cited. Under our doctrine of equality, it must be of general application. "The obligation of every member of the community to contribute his share of the public expense, is a part of the foundation which neither branch of the government is authorized to remove." *Gould* v. *Raymond*, 59 N. H. 260, 278.

Considered purely as a question of taxation, the exemption granted here is invalid, because it lacks the essential element of equality. It applies to one taxpayer only. All others owning property similarly situated are taxed. The plaintiff is not exempted merely because its property consists of a woolen mill, but because of the added and essential fact that the mill belongs to this particular company. The mere statement of the proposition is sufficient to demonstrate that the

act cannot be sustained here upon the theory that the legislature has power to select the classes of property upon which taxes shall be laid.

The doctrine of *State* v. *Griffin,* 69 N. H. 1, that there may be a general law applicable to a particular place, which was applied in sustaining the special exemption to the Enfield water works (*Canaan* v. *District,* 74 N. H. 517, 547), is not involved here. In that special exemption there was a public benefit, open to everyone in Enfield. It was a general law, applicable to a particular place. Here there is a particular law, applicable to one party only. No public right being involved, the exempting act is in no sense general. It is the bald situation of exempting A from a tax imposed upon B. There may be a general law applicable to a particular place, but an act applying to a particular person in his private capacity cannot be so classified.

In *Canaan* v. *Enfield,* 74 N. H. 517, it is distinctly held that a special exemption is sustainable only upon a theory of the exercise of the protective power. Considered purely as an instance of an exercise of the power to tax or refrain from taxing, its invalidity was declared to be established. "If the question is considered as merely one of equality in taxation, this conclusion seems abundantly sustained by our decisions. . . . But the principle involved in the question of legislative power to pass the enabling act is not one of taxation, but of exemption." *Ib.,* 537, 538. Although the opinion just quoted was not concurred in by a majority of the court, it was adopted in a later case as embodying "a correct statement of the law." *Keene* v. *Roxbury,* 81 N. H. 332, 333.

VI. History is appealed to as justifying the exemption. It is said that such has been the practice from the time the constitution was adopted, and that the *Opinion of the Court,* 58 N. H. 623, confirms this view. But the opinion does not rely upon that practice as authority. It deals solely with the act of 1860 (Laws 1860, *c.* 2361; G. L., *c.* 53, *s.* 10) conferring upon all towns a power to vote a special ten year exemption. It makes no reference to the early practice save to say that the justices are not aware that similar acts "passed in the last century" and contracts thereunder were "questioned by the generation that made and adopted the constitution." *Ib.,* 624. The whole argument there was for the purpose of showing a common understanding, evidenced by practice. Opinion upon the constitutionality of the practice was expressly withheld.

These early acts are reviewed in *State* v. *Company,* 60 N. H. 219, 258–261, where they are treated as instances of the exercise of the

protective power, and not of the tax power. Opinion as to the constitutionality of such acts was again withheld. "Whether, in all or any of the instances of exemption, the protective power has been constitutionally exercised, we need not now inquire." *Ib.*, 260. The case does however deal with the argument now advanced in its relation to questions that are in substance matters of taxation. It considers the value of such transactions as precedents on that subject.

"Even after the Revolution, and the adoption of the Constitution . . . little can be claimed for the courts on the score of their scientific administration of the law, according to strict legal rules. It was not, in the very nature of things, that legal investigations should be pursued, at that day, as they have been since." *Pierce* v. *State*, 13 N. H. 536, 557, 558. "In that case Judge *Parker* explains why we do not look with confidence to the period immediately succeeding the Revolution for judicial precedents. And the want of legal learning and skill was not confined to the courts. The people, few in number, recovering laboriously from the effects of the war, concerned themselves with practical results. With little leisure for seeking grievances in mere formal defects of their own legislation, paying little attention to the difference between the tax power and other powers, and largely controlled in their views of public affairs by their pre-constitutional usages, they were satisfied with customary modes of assessment that did not appear to them substantially inequitable." *State* v. *Company, supra,* 246, 247.

Instances might be multiplied which show that the legislative practices of that time have very little weight upon the issue of constitutional limitations upon legislative power. The reference to those practices in the *Opinion of the Court,* 58 N. H. 623, is not to support the validity of the practice, but merely to adduce evidence that a certain understanding was commonly entertained in 1860 and 1879. If the justices had then thought that the early practice was controlling, or was sufficient, with other considerations, to settle the issue in favor of the constitutionality of the exemption law, opinion on the subject would not have been withheld because of the difficulties involved and the time needed for investigation.

These enactments are of value in the present case solely as evidence of the state of mind of their creators. The issue of innocent reliance upon past transactions is excluded, as before stated. It is of little moment that scientific analysis shows plainly that the early acts are instances of using the protective power. If they were not so considered by the men of that day, their undisclosed character throws

no light upon the thought of that time. Because of the general terms of most of these acts passed before 1805, whereby everyone similarly circumstanced had an equal benefit from them, it may well have been thought, if the matter of limitation of legislative power was thought of at all, that they were justified as establishing classes of non-taxable property. Special exemption, in the sense of a privilege given to one but not to another similarly circumstanced, was not a practice at first. So far as has been ascertained, there is but a single instance of such action prior to 1805. In 1789, Eliphalet Hale's paper mill at Exeter was granted a special exemption for ten years. 5 N. H. Laws, 428.

The practice of granting specific exemptions to individuals or corporations (chiefly the latter) began to flourish in 1805. Failure to notice these acts, and the statement (in *Williams* v. *Park*, 72 N. H. 305, 312) that "a careful examination has not brought to notice any statute upon the subject passed between 1819 and 1860," are accounted for by the fact that the private acts of that time were published at a later date. Recent publication has made them available, and reveals the fact that about sixty such acts were passed from 1805 to 1820. These provisions were usually parts of acts of incorporation, although there were several renewals and a few were granted to individuals upon petition. There were also two general acts, each in force for a short time.

In 1808, it was enacted that certain capital stock of new manufactories be exempted for five years. 7 N. H. Laws, 770. This was repealed in 1814 (8 N. H. Laws, 333); and in 1816 a two years' partial exemption was given to established manufactories. 8 N. H. Laws, 496. After 1820, the practice seems to have fallen into disuse, there being but few instances of its use in the decade 1820 to 1830.

It is manifest that the practice of that time is not to be dismissed upon the ground that it was sporadic. The real reason why it has no force as an argument for its constitutionality is that given in *State* v. *Company*, 60 N. H. 219, 246, 247, before quoted.

A clear idea of the lack of consideration then given to constitutional limitations upon legislative power is best gained by an examination of the legislation of that period as a whole. This reveals what today seems to be an amazing disregard of the plainest principles. New trials were granted by the legislature quite as a matter of course. In spite of occasional refusals by the court to recognize the validity of such action (dating from 1791, *Merrill* v. *Sherburne*, 1 N. H. 199, 216), the practice continued until the decision of that case in 1818.

In one instance at least, the legislature went so far as to enact that a copy of a lost will should be filed in the probate office, and when so filed should be "taken used and considered as the last Will and Testament of the said Jane Simpson and that the said Judge approve of the same accordingly," etc., 6. N. H. Laws, 223, 226. ". . . that illegal procedure was not discontinued until it had flourished, under constitutional prohibition, for the space of thirty-four years. . . . For a shorter time, the ascendency of usage over legal rights was still more conspicuous in New Hampshire slavery. . . . Slaves were taxed, like horses and cattle. . . ." *State* v. *Company*, 60 N. H. 219, 248.

In matters of taxation other than exemptions, there was a like disregard of constitutional limitations. Specific taxes, usually of so much per acre, were constantly laid upon town after town. The list of such taxes, in Robinson's History of Taxation in New Hampshire, 187, said to show "to what extent use was made of such taxes," was made before the publication of the special acts of the time, and contains but a fraction of those passed. They were not only voted by the legislature but in many instances the same authority assumed to appoint a committee to levy and collect the tax. Not infrequently this committee was authorized to expend the money (usually for highway purposes) and in several cases the specific road upon which it was to be laid out was designated.

There is considerable evidence of an awakening to an appreciation of the force of the constitution in these respects about 1820. As before stated, the practice of granting exemptions was then practically discontinued. Awarding new trials was successfully resisted in 1818.

Not only was *Merrill* v. *Sherburne, supra,* decided that year, but the legislature adopted a resolution "That the Justices of the Superior Court of Judicature be requested to express to the Legislature at their next session, an opinion in writing on the following question, viz:

"Has the Legislature a right to grant new trials or restoration to law in any case; and if so, in what case or cases?" House Jour. 1818, p. 239.

In response to this the justices filed a brief opinion, approving the opinion in *Merrill* v. *Sherburne,* and annexing a copy thereof as a part of their reply. *Opinion of the Justices,* House Journal 1819, *p.* 244 *et seq.* The importance of this opinion lies in the official approval therein by *Richardson,* C. J., of the annexed opinion. Having been of counsel, he did not sit in that case; but this legislative record shows his concurrence in the views there expressed.

The practice of levying taxes upon individual towns or places was said not to be a legislative practice in 1827. *Opinion of the Court,* 4 N. H. 565, 570. It appears to have been discontinued in 1818. Robinson, Taxation in N. H. 186. But there were still some supporters of the idea, and therefore the opinion just cited was asked for. The journal of the house discloses petitions for such levies upon six towns and places. These were all postponed, and the resolution calling for the opinion was adopted. House Journal, 1827, *pp.* 192, 193.

This period may fairly be looked upon as marking the beginning of constitutional interpretation. Before that the subject evidently had little attention. The practice of that generation appears to have resulted from a failure to consider such questions, rather than from an idea that the true construction warranted the legislative practices.

It was but natural that this should be so. The constitution contains little of specific limitations upon the taxing power. The relation of that power to the guaranty of property rights was not thought of. Indeed it was not noted until a much later date. In the earlier decisions upon the constitutional right of equality, the court were unable to point to any specific provision guaranteeing it. The conclusion then adopted, and long followed, was that it was to be implied from the whole spirit of that document. It was not until the publication of the dissenting opinion in *Orr* v. *Quimby,* 54 N. H. 590, that the fact was made plain that an equal property right is so specifically guaranteed in the bill of rights that it necessarily limits all subsequent grants of power to deal adversely therewith.

The idea that "little weight as a precedent" is to be "attached to decisions upon questions which may have been involved, but which were not presented to or considered by the court" (*Wyatt* v. *Board,* 74 N. H. 552, 561), is especially applicable to this situation. ". . . cases . . . in which the question of equal right was not raised by counsel or considered by the court, cannot be regarded as decisive of that question." *Gould* v. *Raymond,* 59 N. H. 260, 275. The early legislative practice is substantially without weight upon the issue of constitutional limitations upon the powers of taxation and appropriation.

Further evidence that there was no prevailing idea that these special exemption statutes were constitutional is found in the report of the suit of the *Souhegan Nail &c. Factory* v. *McConihe,* 7 N. H. 309. The plaintiff company had been granted a ten-year exemption in 1819. It was taxed upon certain property, by the town of Merri nack, in 1826, and this suit was the outcome of an attempt to collect the tax. The issue of the constitutionality of the exemption was raised, but

as it was held that it did not apply to the taxed property, if valid, it was deemed "unnecessary, therefore, to consider whether the exemption was constitutional." *Ib.*, 316. But the arguments of counsel are reported, and from them we get an insight as to the thought of the time upon this subject.

Parker, for the defendant, puts the claim squarely upon the doctrine of equality. ". . . the clause of the act of incorporation, which purported to exempt the capital stock from taxation, was unconstitutional and void. By the constitution, every member of the community is bound to contribute his share towards the expenses of the government. Bill of Rights, *art.* 12.

"In 4 N. H. Rep. 565, there is an opinion of the court, that it is unconstitutional for the legislature to assess a tax on a particular town. A similar difficulty occurs from exempting a town, or other corporation, or a person, from taxation. It destroys the equal proportion in the same manner. If this corporation is exempted, the inhabitants must pay greater taxes. 12 Mass. Rep. 252, *Portland Bank* vs. *Apthorp*.

"An exemption of all factories from taxation is altogether different from an exemption of one particular factory. The latter is like the exemption of a single individual." *Ib.*, 312, 313.

The eminent counsel for the plaintiff, Charles H. Atherton, did not undertake to deny the soundness of this argument. He seeks to sustain the exemption upon the theory of charter contract rights. He admits that "There may be cases where an exemption of existing corporations would be unconstitutional. But when a new corporation is created, the legislature may exempt in the original act — in the contract creating the existence." *Ib.*, 311. There is here no suggestion that the exemption is justified as promoting a public use, or that long practice has established the interpretation of the constitution.

The reason why the issue of the constitutionality of these exemptions was not further contested is to be found in the fact that substantially all of them had expired before the litigation arose. Of the term exemptions existing in 1819, those on $661,000 of property expired that year, leaving only $222,000, all of which expired in the next two years. House Jour. 1819, *p.* 79. As before stated, the general two year exemption expired in 1818. The practice had been abandoned, and the matter was a closed incident for another generation. Report of Geo. Y. Sawyer, Chairman Tax. Com. (1876), *p.* 18; Robinson, History of Taxation in N. H., 109. Notwithstanding this period was that of greatest activity in granting charters for textile companies, there were no exemptions.

In 1860, the practice of granting special exemptions was renewed. The form in which the grant was stated is suggestive of doubts as to the validity of such legislation. "All manufacturing establishments . . . are exempted from taxation for ten years after the passage of this act; provided towns and cities in which such manufacturing establishments may be located . . . shall . . . give their assent to such exemption; and such assent shall have the force of a contract. . . ." Laws 1860, c. 2361. The mantle of general exemption was sought to cover what is later made special by the proviso; and the contract theory is also employed to help out a doubtful situation.

The exemption act of 1860 may very likely have resulted from a tendency of the times, described by an eminent jurist of that day in the following language: "It cannot be denied, we think, by anyone who has examined the question carefully, that there is a most alarming disposition manifested in all directions, within the last few years, to take possession of public money for private uses. We need not refer to particular instances, but everywhere, and as well among the best men we have as others, there seems to be no scruple in appropriating public money to private uses, provided only it be done for the good of large numbers. And there seems no difficulty, anywhere, in bringing the legislatures into these views." *Isaac F. Redfield*, 12 Am. Law Reg. (N. S.) 499 (1873).

The opinion rendered nineteen years after the act was passed (*Opinion of the Court*, 58 N. H. 623) does not undertake to either resolve the doubts or deny their existence. The advice then given was that the legislature pursue a course of conduct which would avoid the question. As before stated, none of the later cases undertake to deal with the subject.

Certainly as late as 1901, the question of constitutionality was regarded as open. In reply to an inquiry by the senate as to power to grant exemptions to summer hotels, advice was given that the power was the same as that relating to manufacturing companies; and it was said that "Whether the true construction of the constitution authorizes the making of any exemption tax contracts, is a question which would require so much investigation that a well considered answer could not be given in season to afford any aid at the present session of your honorable body." *Opinion of the Justices*, 70 N. H. 642, 643.

More important than the fragmentary evidence of general understanding, or lack of it, which is to be found in the history of early

legislation upon this subject, is the development by the court of the theory concerning the extent and pervasiveness of the constitutional guaranty of the rights of the individual against encroachment by the state. As before suggested, it was the accepted view until as late as 1874 that a law giving A's property to B "would be repugnant to the constitution. Not indeed to the letter of any particular clause contained in it, but to its spirit and design. . . ." *Concord Railroad* v. *Greeley*, 17 N. H. 47, 56. Similar ideas were expressed in *Petition of the Mount Washington Road Co.*, 35 N. H. 134; *East Kingston* v. *Towle*, 48 N. H. 57; *Eaton* v. *Railroad*, 51 N. H. 504.

"There is, in our reports, an uncertainty as to the origin of the rule requiring compensation. It was decided nearly fifty years ago that our constitution is silent on the subject, and that decision seems to stand approved, or, at least, not overruled down to the present time. And yet it has been taken for granted, as a general theory, that a statute authorizing the taking of private property for public use, without compensation, would somehow or other be void. The rule, supposed to rest for a long time on some unsettled ground, possibly unsound, and certainly not well considered, has taken on a degree of mystery and obscurity; and its strictness and efficiency have not been promoted by the common understanding that its foundation had not been, and perhaps had better not be, thoroughly examined. . . .

" 'All men have certain natural, essential, and inherent rights; among which are the . . . acquiring, possessing, and protecting property.' Bill of Rights, art. 2. This is not silence, nor rant and declamation, nor advice and exhortation; it is an express declaration of the private right of proprietorship. It is attached to the constitutional grant of governmental powers, as a limitation of the grant, a declaration of a right not surrendered to society. Whether it be called a declaration of the reserved right, or a reservation of the right, or a guaranty of it, or a prohibition of a violation of it, is immaterial. It is a reservation that makes the right a constitutional one. . . . It does not leave the court exposed to any temptation to set up an illimitable jurisdiction on the doctrines of natural justice, the maxims of universal law, or the principles that hold society together." *Dissenting Opinion of Doe, J., Orr* v. *Quimby*, 54 N. H. 590, 605, 606, 616.

The doctrine of the foregoing opinion was soon adopted as a guiding principle in matters of taxation and has been applied ever since, with two possible exceptions. "So much of his share as he escapes the payment of, his neighbors are compelled to pay for him. So much of

his obligation as he avoids, he casts upon them. His payment of his share is as much their constitutional right as it is his constitutional duty. His non-performance of his duty is a violation of their right." *Edes* v. *Boardman*, 58 N. H. 580, 587.

This theory of the compelling effect of the constitutional guaranties of equality has been elaborated with a wealth of argument and illustration rarely if ever excelled. *First National Bank* v. *Concord*, 59 N. H. 75; *Bowles* v. *Landaff*, 59 N. H. 164; *Gould* v. *Raymond*, 59 N. H. 260; *Robinson* v. *Dover*, 59 N. H. 521; *Boston, Concord &c. Railroad* v. *State*, 60 N. H. 87; *State* v. *Company*, 60 N. H. 219; *State* v. *Pennoyer*, 65 N. H. 113.

Throughout the term of Chief Justice *Doe* the principle received constant support in all but two instances. The advice to the house of representatives (58 N. H. 623) that they follow a course which would evade the constitutional question, and the announcement that the savings bank tax at a fixed rate "is an anomaly, resting on peculiar grounds of public policy, and is universally understood to have acquired the position of an exception to the constitutional rule of equality" (*Boston, Concord &c. R. R.* v. *State*, 62 N. H. 648, 649), are the only instances of a failure to apply the rule of equality.

The *Opinion of the Court*, 58 N. H. 623, does not deny the generally accepted rule, but the method there used to deal with the subject is reasonably claimed to show a disposition not to apply the rule at all times and at all costs. But it is not a negation of the general theory of constitutional equality. Whatever opinion may be entertained concerning the method employed to avoid the issue, it remains true that it was avoided.

The decision concerning the savings bank tax is not open to any such reconciliation with the trend of decisions contemporary with it. The tax became an exception to the constitutional rule of equality "solely by virtue of the statute creating it, and less than twenty years of public acquiescence." *State* v. *Griffin*, 69 N. H. 1, 33. The idea thus advanced has not been treated as having any general application. "If the savings bank tax is an anomaly to the extent that other property holders may not claim that their property cannot be taxed at a different rate, the effect of the anomaly cannot be extended beyond the acquiescence which created it." *Wyatt* v. *Board of Equalization*, 74 N. H. 552, 570.

There is no suggestion that the original observations as to this tax mean that the true interpretation of the constitution permits such inequality. It is "an anomaly" which has "acquired the position of

an exception." by universal understanding. Being an anomaly, it has no part in the body of authority relating to normal interpretation.

Whatever weight these two pronouncements might have, if they stood alone, it is evident that they are inconsequential when contrasted with the long line of thoroughly considered cases holding to the theory of constitutional equality.

In the thirty odd years since the death of Chief Justice *Doe*, the court has undertaken to follow the course upon this subject which he so ably and definitely charted. *State* v. *Jackman*, 69 N. H. 318; *Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 200, 204; *State* v. *Ramseyer*, 73 N. H. 31; *Opinion of the Justices*, 76 N. H. 588; *Ib.*, 597; *Ib.*, 609; *Opinion of the Justices*, 82 N. H. 561.

In *Williams* v. *State*, 81 N. H. 341, 352, the often quoted summary of the result of the earlier decisions, made by Chief Justice *Doe* in his unreported opinion prepared in *State* v. *Griffin*, 69 N. H. 1, is "adopted as a correct statement of New Hampshire law."

It is to this more recent history, replete with sound exposition of pertinent constitutional principles, although not dealing with the specific item here involved, that we look for authoritative judicial precedent. Compared with this, the early legislative practice on the specific topic, in harmony with other concurrent unconstitutional legislative action, and not shown to have been taken with any question of constitutional power in mind, is of little value on the issue of constitutional interpretation. It is true that the actors of the earlier day may have known the views of the constitution makers, and that such first hand knowledge could not have entered into the deliberations of later generations. But that possible advantage, not shown to have influenced the action taken, is a most unsubstantial factor. It is much too shadowy to overturn well considered and numerous authorities which demonstrate that the true meaning of the constitution is against the practice relied upon.

VII. If it were permissible to hold, contrary to the views hereinbefore expressed, that aiding private manufacturing corporations is a public purpose, for which public funds could be appropriated, the plaintiff's exemption would be prohibited by another constitutional provision. ". . . the general court shall not authorize any town to loan or give its money or credit directly or indirectly for the benefit of any corporation having for its object a dividend of profits or in any way aid the same by taking its stock or bonds." Const., Part Second, *art.* 5. This amendment to the grant of legislative power,

including the power to lay taxes, was adopted in 1877, and went into effect June 1, 1879. Laws 1877, *c.* 33, *s.* 1. The immediate cause for its presentation to the convention was the decision, rendered the preceding March, that an act authorizing a town to raise money to aid in the construction of a railroad was constitutional. (*Perry* v. *Keene,* 56 N. H. 514, 520.) Journal Const. Conv., 1876, *pp.* 58, 264 *et seq.*

The decision in that case went upon the ground that a railroad is so far public that an appropriation for its use is for a public purpose. The amendment was primarily intended to prevent such donations in the future. But general language was used. It applies to "any corporation having for its object a dividend of profits." It not only forbids donations to public utilities having such an object, but *a fortiori* it prohibits gifts to corporations that are strictly private, or public only in a remote sense.

That this amendment would forbid a grant to the town of power to appropriate money directly to obtain a new industry, is unquestionable. A grant of special tax-exempting power does not stand any differently. The language of the prohibition is broad. The power to either directly or indirectly make the donation is withheld.

VIII. Limitations upon the power of a state to deal with this subject are also found in the constitution of the United States. The federal rule that taxation must be for a public purpose, and that aid to private manufacturers is not such a purpose, has already been quoted. It is undoubtedly the law that an appropriation to such a purpose of money raised or to be raised by taxation is in violation of the federal constitution. "It is taxation which takes the private property of one person for the private use of another person." *Parkersburg* v. *Brown,* 106 U. S. 487, 501.

"The general grant of legislative power in the Constitution of a State does not enable the Legislature, in the exercise either of the right of eminent domain or of the right of taxation, to take private property, without the owner's consent, for any but a public object. Nor can the Legislature authorize counties, cities or towns to contract, for private objects, debts which must be paid by taxes. It cannot, therefore, authorize them to issue bonds to assist merchants or manufacturers, whether natural persons or corporations, in their private business. These limits of the legislative power are now too firmly established by judicial decisions to require extended argument upon the subject." *Cole* v. *La Grange,* 113 U. S. 1, 6, 7.

"The taking by a state of the private property of one person or corporation, without the owner's consent, for the private use of

another, is not due process of law, and is a violation of the 14th Article of Amendment of the Constitution of the United States." *Missouri Pac. Ry* v. *Nebraska*, 164 U. S. 403, 417.

It may be said that the local rule that the issue here is not one of taxation but of the exercise of the protective power, might not be followed by the federal court, and that the issue might there be treated as purely one of taxation. But if such a conclusion were reached by that court, it by no means follows that the act would not be deemed invalid under the federal constitution. It is true that states have very broad authority in the matter of the selection of the objects and methods of taxation; yet there are federal limits which must be observed.

It was long ago declared that "No greater burdens should be laid upon one than are laid upon others in the same calling and condition." (*Barbier* v. *Connolly*, 113 U. S. 27, 31); and that a tax laid must "operate equally and uniformly upon all persons in similar circumstances." (*Kentucky Railroad Tax Cases*, 115 U. S. 321, 337.) A state has full liberty "as to the property to be taxed and the modes of taxation, providing all property similarly situated is treated in the same way." *Florida &c. R. R.* v. *Reynolds*, 183 U. S. 471, 477.

". . . the power of the state to classify for purposes of taxation is of wide range and flexibility, provided that the classification rest upon a substantial difference so that all persons similarly circumstanced will be treated alike." *Hart Refineries* v. *Harmon*, 278 U. S. 499. Classification "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Frost* v. *Commission*, 278 U. S. 515, and cases cited.

"It is sufficient if all of the same class are subjected to the same rate and the tax is administrated impartially upon them." *Michigan Cent. R. R.* v. *Powers*, 201 U. S. 245, 302. "But . . . if the law is of such a character that there is no reasonable presumption that substantial justice generally will be done, but the probability is that the parties will be taxed disproportionately to each other and to the benefit conferred, the law cannot stand against the complaint of one so taxed in fact." *Gast Realty Company* v. *Company*, 240 U. S. 55, 59.

And in determining the question whether a state law offends against the federal constitution, the federal court is not bound by the state view of what is a public use or purpose. It will apply its own definition of those terms. *Fallbrook Irrigation Co.* v. *Bradley*, 164 U. S. 112, 159. The federal question would be whether a tax laid upon taxpayers in

general, but from which A is exempt, for the sole reason that his property is devoted to a specified private use, is not a disproportionate tax, to be set aside upon "the complaint of one so taxed in fact."

The conclusion is that the act in question is invalid under the provisions of the state constitution; and that the exemption is probably invalid, under the federal rule, as offending against the due process of law provision of the fourteenth amendment to the constitution of the United States.

The plaintiff is not entitled to the relief prayed for.

*Petition dismissed.*

ALLEN, J. did not sit: the others concurred.